[Cite as *State v. Brooks*, 2012-Ohio-2600.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 25687 |
| | |
| Appellee | |
| | |
| v. | APPEAL FROM JUDGMENT |
| | ENTERED IN THE |
| RYDELL R. BROOKS | COURT OF COMMON PLEAS |
| | COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 08 05 1670 (A) |

DECISION AND JOURNAL ENTRY

Dated: June 13, 2012

CARR, Presiding Judge.

{¶1}   Appellant, Rydell Brooks, appeals the judgment of the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}   This case stems out of an incident which occurred during the early morning hours of May 18, 2008.  On May 30, 2008, the Summit County Grand Jury indicted Brooks on one count of attempted aggravated murder in violation of R.C. 2923.02/2903.01(E), a felony of the first degree; one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the first degree; one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree; and one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a felony of the fourth degree.  The first two counts in the indictment contained firearm specifications.

{¶3}    Brooks waived his right to a jury trial and a bench trial commenced on October 12, 2010.  Brooks and his co-defendant, Edward Davis, were tried together.  The trial court subsequently found Brooks not guilty of attempted aggravated murder and the related firearm specification, and not guilty of felonious assault and the related firearm specification.  The trial court found Brooks guilty of tampering with evidence.  At the close of the State's case, the trial court granted Brooks' Crim.R. 29 motion and the charge of carrying a concealed weapon was dismissed.  Brooks was sentenced to a term of four years imprisonment for his tampering with evidence conviction.  The trial court's sentencing entry was journalized on October 20, 2010.

{¶4}    Brooks filed his notice of appeal on November 18, 2010.  On appeal, he raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

BROOKS'[] CONVICTION FOR TAMPERING WITH EVIDENCE WAS BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW.

{¶5}    In his sole assignment of error, Brooks contends that his tampering with evidence conviction was not supported by sufficient evidence.  This Court disagrees.

{¶6}    In support of his assignment of error, Brooks argues that there was no evidence presented that he knew an investigation was in progress or likely to be instituted at the time that he disposed of his guns and holster.  At most, according to Brooks, "the evidence shows only that he instinctively reacted out of a natural sense of self-preservation, in order to avoid a potential life-threatening confrontation with police in the event that they were chasing him." Brooks further argues that the State never demonstrated that he intended to impair the availability of evidence in an official proceeding or investigation.  Brooks further notes that there was no evidence that the police had any difficulty recovering the guns and holster.

{¶7} Brooks was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which states, "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶8} The law pertaining to a challenge to the sufficiency of the evidence is well settled:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Galloway*, 9th Dist. No. 19752, 2001 WL 81257 (Jan. 31, 2001). The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *State v. Walker*, 9th Dist. No. 20559, 2001 WL 1581570 (Dec. 12, 2001); *see also State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997).

{¶9} Officer Vince Tersigni testified on behalf of the State at trial. At approximately midnight on the night of May 18, 2008, Officer Tersigni and his partner, Nate Milstead, were patrolling on Bellows St. in Akron, when they passed a green minivan. When the officers smelled the odor of marijuana emanating from the minivan, they performed a "U-turn" so that they could identify the license plate number. The officers proceeded to put the license plate number into their LEADS computer database. Before the computer was able to produce any information, the minivan pulled into the driveway of an abandoned house located at 1138 Bellows St.

{¶10} After the minivan pulled into the driveway, Officer Tersigni asked Officer Milstead to drive past the house so that he could investigate on foot. Officer Milstead then dropped off Officer Tersigni and proceeded to drive the cruiser around the block to observe whether the minivan intended to exit the driveway. When Officer Milstead pulled away in the cruiser, Officer Tersigni heard the doors of the minivan opening and closing, and voices saying, "Hurry up. They are leaving, they are leaving." As Officer Tersigni approached the house on foot, he saw an individual in the rear of the house. Officer Tersigni testified that the individual was "in between the houses as if he was about to start running southbound behind the houses." When the individual saw Officer Tersigni, he said, "Oh, s***" and began to run northbound behind the houses. Officer Tersigni followed the individual by running parallel with him on the sidewalk in front of the houses. Officer Tersigni then turned the corner of the house to make his way to the backyard. Officer Tersigni testified that, "As soon as I turned the corner, I saw two individuals standing by the vehicle, and just saw one muzzle flash." Officer Tersigni indicated that the muzzle flash came from the passenger side of the vehicle and that the two individuals were dressed in all black. Officer Tersigni testified that the shot was fired at him.

{¶11} After Officer Tersigni saw the muzzle flash, one of the individuals standing next to the van turned around and began running southbound in the backyards on Bellows St. Officer Tersigni started to run southbound but immediately noticed two individuals standing in the driveway next door to where the original shot was fired. Officer Tersigni then saw three additional muzzle flashes which indicated he was the target of gunfire. At that point, Officer Tersigni sprinted across the street to take cover behind a tree because he was unaware of how many people were shooting at him. Officer Tersigni further testified that he did not have his weapon drawn during the pursuit. As Officer Tersigni waited for Officer Milstead while taking

cover behind the tree, he heard individuals "crashing through the back yards" on Bellows St. Officer Tersigni sent out an emergency signal on his radio so that other units could respond to the area. Officer Tersigni testified that the suspects were later apprehended by responding officers at the corner of Marcy St. and Cole Ave.

{¶12} Officer Milstead testified that after he dropped off Officer Tersigni, he heard gunshots. Officer Milstead further testified that he heard Officer Tersigni yell, "Nate, get back here" over the radio. Officer Tersigni was running across the street as Officer Milstead returned to the scene in the cruiser. Officer Milstead heard the suspects flee from the scene through the back yard.

{¶13} Officer Eric Wagner also testified on behalf of the State at trial. Officer Wagner testified that in the early morning hours of May 18, 2008, he and his partner, Officer Jeff Smith, were on patrol at the corner of Grant St. and Conn Ave. when they learned that shots had been fired at an officer and that the suspects were heading westbound from Bellows St. Officer Wagner was informed over the radio that the suspects were black males wearing all dark clothes. Officer Wagner and his partner then drove southbound on Grant St. and subsequently made a westbound turn on Cole Ave. where they arrived at the corner of Cole Ave. and Marcy St. Just prior to reaching the intersection, Officer Wagner, who was driving the cruiser, dropped off Officer Smith so that he could proceed on foot. When Officer Wagner arrived at the intersection of Marcy St. and Cole Ave., he exited the cruiser and immediately saw two men walking toward him. Because shots had allegedly been fired at officers, Officer Wagner drew his weapon and ordered the two men to get on the ground. The men were placed in handcuffs and Officer Tersigni arrived shortly thereafter and identified the two males. Officer Wagner identified Brooks as one of the men who was apprehended.

{¶14} Officer Wagner's partner, Officer Smith, also testified on behalf of the State. After the two suspects were apprehended, Officer Smith transported Brooks back to the police station. Officer Smith observed that Brooks' clothes were torn and there were grass clippings on his pants. Officer Smith testified that this was consistent with Officer Tersigni's report that the suspects had been running through backyards and climbing fences.

{¶15} Several law enforcement officials traced the path from where the shots had been fired at the abandoned house to the place where Brooks and his co-defendant, Davis, were ultimately apprehended. Lt. Thomas Wykoff testified that he responded to the intersection of Marcy St. and Cole Ave. less than a minute after hearing over the radio that shots had been fired at an officer. Lt. Wykoff arrived as the two suspects were being taken into custody. Lt. Wykoff asked the other officers which path the suspects had taken to the place of their arrest, and then proceeded to trace the path the suspects had traveled in search of weapons or any other evidence that might have been dropped along the way. When Lt. Wykoff walked behind the house located at 1305 Marcy St., he found a trash can with an open lid. Inside the trash can, Lt. Wykoff found a shoulder holster. After alerting his fellow officers to the shoulder holster, Lt. Wykoff began to examine an area behind the garage where some black culvert piping was located. In the center of the piping, which had been coiled for storage purposes, Lt. Wykoff found three guns. Photographs of the shoulder holster in the trash can, as well as the guns surrounded by the culvert piping, were introduced as exhibits at trial. Lt. Wykoff described one of the guns as a black and silver Bersa. Lt. Wykoff also found a black mask that was close in proximity to the trash can containing the shoulder holster.

{¶16} Officer Donald Schismenos testified that other items were recovered by law enforcement officials in the back yards of the Marcy St. residences, including black gloves and black shirts.

{¶17} Brooks testified on his own behalf at trial. Brooks indicated that the events which transpired in the early morning hours of May 18, 2008, were preceded by several other perilous incidents earlier that month. On one afternoon in early May 2008, Brooks was in the company of his co-defendant, Edward Davis, as well as their friends Greg Williams, Anthonie Williams, and Cameron Rivers. The five men were conversing on the front porch of Davis' house on Cole Ave., when two cars drove into the neighborhood. Greg Williams approached the cars and an argument ensued. The argument promptly escalated into a physical altercation. When approximately "seven or eight" men got out of the two cars to take part in the altercation, Brooks and his friends came off the porch in defense of Greg Williams. Brooks described the altercation as a "fist fight" that did not involve weapons. After five to six minutes, Davis's family came out of the house and broke up the fight.

{¶18} Brooks testified that on that same day at nightfall, the two cars returned to the neighborhood "around probably 8:00 or 9:00." Brooks and his friends were still on the porch when he "heard some shots fired." Brooks was uncertain as to where the shots came from but the two cars were in the vicinity of Davis's house when the shots were fired. Brooks clarified that nobody on the porch fired shots at that time. Brooks further testified that the two cars immediately left the neighborhood after the shots were fired.

{¶19} Later in May, Brooks was driving on Talbot Ave. in Akron, on his way to pick up his family at Joy Park when he noticed a group of men standing outside a house. Brooks testified that as he passed the men, they fired shots at his car. Brooks testified that the bullets

"[g]razed the top of the car." While he did not know the exact number of shots fired at his vehicle, Brooks testified it was "around two or three." Brooks did not recognize the people who fired the shots. When asked what he did after the men fired at him, Brooks testified, "I took my family home. And later on that night, I came back in and shot at the house where I [saw] the group of guys standing outside." Brooks testified that he did not know if he hit anyone. Brooks used his Bersa to shoot at the house. When asked how many shots he fired at the house, Brooks testified, "Around seven. I emptied the gun, so seven."

{¶20} Brooks testified that another incident occurred during the early morning hours of May 17, 2008. Davis's sisters were traveling in their car when they were run off the road by another vehicle. Brooks testified that all of the passengers in the car had to go to the hospital to be treated for injuries. Davis and Brooks proceeded to drive around looking for the men responsible for running Davis's sisters off the road. Brooks testified that they were unable to locate the men.

{¶21} On the evening of May 17, 2008, Brooks was at Davis's home when Greg Williams, Anthonie Williams, and Cameron Rivers arrived in a green van. The five men got into the van and began driving to "the Elks bar." Brooks testified that he was in possession of two guns when he entered the vehicle, namely a ".380 Bersa and a nine millimeter Skyy." The men were driving to the Elks bar to speak with "an older person in the family of one of the guys who we had the problem with." Brooks clarified that they intended to speak with the uncle of "[o]ne of the guys who we had the altercations with." Brooks testified that he was carrying the guns "[f]or protection" because he did not know how the conversation would turn out. When the van got to the corner of Stanton St. and Bellows St., they observed a police cruiser that had stopped at the stop sign. As the van then turned south on Bellows St., the men noticed that the police

cruiser had made a U-turn and positioned itself behind them. The driver of the van, Anthonie Williams, promptly turned into the driveway of a house on Bellows St. After the police cruiser drove by the house, Brooks exited the vehicle and ran into the back yard. At that time Brooks was carrying the two guns, as well as "the mask and gloves that were in [his] hoodie." Brooks testified that he went to the back yard "[t]o hide the things that I had one me. I was trying to find a place to put them."

{¶22} As Brooks was looking for a place to hide his guns, he heard a voice behind him say, "Oh, s***." Brooks then heard people start to run and he "[t]ook off running" southbound. As Brooks jumped over a fence in an attempt to get away from the scene, he heard a gunshot behind him. Brooks continued to run and jumped several other fences to get to the back yards of the houses on Marcy St. Brooks then began to take everything off because his "first impression was the cops were shooting at us for running." Brooks testified that he "didn't want to [be] found in a back yard with two guns in my hand and dressed in all black by an officer. *** [T]hey could shoot me[.]" Brooks testified that he then "set [the guns] behind the garage." Brooks was unaware of the four other men's whereabouts at that time. Brooks further testified that he "threw" down everything else that he had, including the gun holster, in the back yard. Brooks proceeded to jump over another fence and then he began walking toward Marcy St. At that time Brooks heard a "hard knocking" on the fence coming from behind him. As he walked back in the direction of the knocking, he heard Davis's voice. Brooks and Davis then began walking on the sidewalk to Marcy St. When the two men arrived at the corner of Cole Ave. and Marcy St., they were met by an officer who subsequently placed them under arrest.

{¶23} When asked for clarification on the reason that the five men were going to see the man at the Elks bar that night, Brooks testified:

Basically, to end – end the beef, because it had – it went from alter – it went from starting with us to hurting members of his family, so we – at that point we realized it was getting too out of hand. So the reason why we was going down there, to end the beef, basically to talk to him to see if we could.

**{¶24}** The evidence presented at trial was sufficient to establish that Brooks was aware that an investigation was ongoing when he attempted to hide his guns, shoulder holster, and other miscellaneous items, in violation of R.C. 2921.12(A)(1). Brooks' encounter with police during the early morning hours of May 18, 2008, was the culmination of several precarious episodes which transpired in the weeks leading up to the incident. On the night in question, Brooks and his comrades had armed themselves and set out to put an end to the ongoing conflict. After observing that a police cruiser was trailing their green van, the men pulled into the driveway of an abandoned house. As Officer Tersigni approached the van on foot, he heard doors opening and the men encouraging each other to "hurry up" because the police cruiser had left the area. Brooks testified that he ran to the back yard to "hide" his guns, the mask, and his gloves. Before he could hide the items, Brooks fled the scene when he heard someone yell, "Oh, s***." Brooks further testified that he heard people begin to run. Brooks' own testimony demonstrated that, after hearing a gunshot, he feared the police had fired at him and his friends for attempting to flee. Brooks further specified that he did not want a police officer to find him dressed in all black and carrying guns because he feared that he could be shot. At that point, when he was in fear that the police were in pursuit and had fired at him and his friends, Brooks discarded his guns, the shoulder holster, as well as the black mask in the back yards on Marcy St. Lt. Wykoff's testimony established that the gun holster was found in a trash can and the guns themselves were located inside some coiled black tubing. This evidence, when construed in the light most favorable to the State, was sufficient to establish that Brooks attempted to impair the availability of the evidence in an investigation into ongoing criminal activity.

**{¶25}** It follows that Brooks' sole assignment of error is overruled.

### III.

**{¶26}** Brooks' assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

DICKINSON, J.
CONCURS

BELFANCE, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

NICHOLAS SWYRYDENKO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.